Okay, Calderon v. Six Rent-A-Car. Okay, Calderon v. Six Rent-A-Car. Okay, Calderon v. Six Rent-A-Car. Okay, Calderon v. Six Rent-A-Car. Good morning, Mr. Warwick. Can you come speak with us? Good morning. Brian Warwick on behalf of the appellants this morning. Summary judgment is supposed to be granted only when there are no genuine issues of material fact. In this particular case, there were five specific pieces of evidence that the district court ignored when it ruled that there was no contract between Six Rent-A-Car and the three individuals who had rented Six Rent-A-Cars and signed and agreed to six standardized terms and conditions when they rented those rental cars. The issue was who's responsible for the damage that was allegedly done to those rental cars while they were in the possession of the plaintiffs. Of course, the weird thing about this case procedurally is you originally started by denying that your clients were bound by the terms and conditions, later amended your complaint to assert a breach of contract theory that is predicated on the idea that they are bound by the terms and conditions. You have deposition testimony for your clients denying that they had received the terms and conditions but considerable evidence by your adversary that they would have, that would allow a reasonable inference that they in fact did receive the terms and conditions and the district court effectively stuck you with your client's testimony. As I understand your argument, you should be given the benefit effectively of your opponent's evidence. I'm not saying that pejoratively, Mr. Warwick. I'm inclined to think that's right, but that's what's happened here, isn't it? Absolutely, with one caveat. The time you file your complaint, you have your testimony from your clients that are available to you. You write your complaint, you file it. Then you do some investigation, you do some discovery. During discovery, we found out what actually happens at the sixth rental counter. Not my client's memory, but what actually happens. It doesn't really matter what the earlier complaint said. We're bound by, as I understand it, the second amendment complaint. That's the operative pleading here, right? That's right. What happened was we figured out that because the terms and conditions were available in the kiosk when each of my clients picked up their car, I couldn't very well argue that it didn't matter whether they remember getting it or even if they didn't get it. The law from all three of the states only requires that the collateral document be available and readily identified. I would have been to my client's detriment if I had proceeded down that road only to ignore the law. The law said that as long as these terms and conditions were available to them at the kiosk, then those terms and conditions would be incorporated by reference. I said, okay, well, if they're going to be incorporated by reference, then sixth rental car should be bound by its own terms and conditions that it designed to be incorporated by reference. You can imagine my shock when they filed a motion saying, no, our terms and conditions don't apply to us. And that's the strange position we're in, that the terms and conditions that were designed by sixth rental car to be incorporated by reference were available at the kiosk to all three of my clients. Does it matter that none of your clients actually end up paying any of these fees? Well, Your Honor, I think that when it comes time to, you know, if third parties pay them, you know, my clients are all responsible for it. The fact that my clients had other individuals who voluntarily agreed to pay it on their behalf doesn't mean that the real party who had an injury in fact, for standing purposes or damage purposes, is my client. They just happen to have insurance, so Allstate paid for Mr. Marron. My Ms. Burrell's employer decided to pay. But Ms. Burrell and Mr. Marron both stated during their depositions that they would pay that money back to their employers or to the third party. Does that matter for the breach of contract action or is that really relevant for the FDUPA claim? I think it was relevant to the FDUPA claim because that's... Okay, so help me with that. As I understand Florida's statutory law, there are three elements, a deceptive act or unfair practice, causation, and actual damages. Did any of these plaintiffs actually sustain any actual damages? I think they did sustain actual damage and that money was paid on by each of them for these damage to the vehicle. So they paid the actual damages to their insurance company. I thought money was paid on behalf of each of them, but not actually by each of them. Okay, so if you say that, you know, if you're going to say that the collateral sources don't count, we're going to exclude that, that they took arrangements, then they bought insurance. So they paid for insurance and then the insurance covered that cost. But the payment for the insurance would be some damage. Well, the reason I raise it is Marin and Borrell's invoices were paid for by their employers. Calderon, if I have it right, refused to pay his invoice at all, and Sixth eventually cleared his account of charges. How could a reasonable jury under those circumstances find that any of these plaintiffs actually suffered damages, actual damages? And if the answer is no, we would have to affirm the district court on those grounds, at least as to the FDUPA claim. Would we not? So I think that by excluding the, by making the damages available only to people who actually pay money, what that does is takes the tortfeasor and makes them not liable for wrongful conduct. So they have engaged in the unfair deceptive practice. They have lied about these repairs because they were never made, but then they get to keep the money because it was paid for by third parties. The insurance company and my client's employers cannot sue Sixth Rental. No, Mr. Warwick, I mean. Recover it. It's one thing to say it may well be that your clients have a breach of contract claim. So it's not as if there's no potential liability at all. But the problem is that this is a statutory claim, and the legislature has required for the statutory claim proof of actual damages. But don't we have that whenever you have an insured loss? So we have insured losses for car wrecks, for example, and the insurance company pays that, but we have. That's not clear to me. It's not clear to me. I understand with common law torts, the collateral source rule, that this isn't a common law tort. This is a statutory claim with an express provision in the statute that there has to be a proof of actual damages. So I think, though, that if. . . So you're saying that if my clients had paid the money and then been reimbursed by their employer, would that give actual damages? I think the point is the damages were still paid. The damages were paid by each of these clients because they were given a false document. The problem is the statute requires actual damage. You've got to show something that they sustained, and it looks to me like they sustained nothing. The fact that someone else did doesn't mean that they did. So it strikes me that your argument really boils down to the application of the collateral source rule here. Correct. And does the collateral source rule. . . But your argument turns entirely on the application of the collateral source rule here, does it not? There's no additional argument you are making to answer the problem of actual damages other than the argument about the collateral source rule. Do I have that right? That's correct. All right, so explain to me why the collateral source rule would apply in this statutory context with this FDUPA claim under Florida law. So the collateral source rule is limited in negligence cases, but not all torts. I think a FDUPA tort may be statutory, but it's not negligence. I think that when you look at whether a third party pays on your behalf, if the money was still paid under an unfair deceptive practice, that the cause of action doesn't go away, the damage is still incurred. It was incurred on my client's behalf, just not specifically by my client. The fact that the money was paid is the damages. Otherwise, what we have is a tort that has no remedy. You just get to keep it because some third party paid it. That person can't bring the tort. They're not the actual party in interest. Let me ask the question this way. Can you cite me to any case law anywhere where the collateral source rule has been applied in this kind of statutory context? I've looked, and I can't find it. The closest you can find is California's unfair deceptive trade practices law, but even there they rejected the application of the collateral source rule. Is there somewhere, something, someone who has said you can apply collateral source rule in this kind of statutory context? The only place I have is to go back to old U.S. Supreme Court cases that talk about the principle. They don't call it the collateral source rule. They talk about the principle of who's the real party that's been damaged. There's a tobacco case. That's the U.S. versus the American tobacco case where there's a fire. There was some insurance that had paid for the collateral damage, and they filed suit against the U.S. for a tax stamp. In that case, they found that they still had the right to go to trial and recover, but again, it's not a statutory claim. I don't think that would be very helpful for us in this context with Judge Marcus's question. Do you have any instance where any Florida court, or for that matter, any state court, has applied the collateral source rule for a statutory state deceptive trade practices claim? I do not. Okay. The decision by the trial court here didn't raise those issues as addressing why it was dismissed. The trial court here simply said, hey, look, there was no damages, and cited some cases where there actually were no damages. So on remand, I guess maybe the trial court could address that, but it was kind of an apples and oranges type of analysis. Okay. And just to be clear, you have no such analysis for Mr. Calderon because nobody paid on his behalf. It just wasn't paid. Right. So we filed suit at the time the debt was still outstanding. They only decided to write it off after this lawsuit was filed in an attempt to get rid of his claim, but that is the issue. As far as Mr. Calderon knows, he still has a bill that says he owes that money. Whether they've internally written it off is separate. Okay. Well, Mr. Warwick, you've saved five minutes. Let's hear from Mr. Emery. Morning, Your Honors. Morning. Morning, Counsel Warwick.  May it please the Court. I'm Patrick Emery on behalf of the Appalachia 6th Rent-A-Car LLC, which is headquartered in Fort Lauderdale, Florida. The district court's decision granting a summary judgment against the plaintiff's FDUPA and breach of contract claims to be affirmed for two simple reasons. Number one, under the FDUPA claim, they did not prove causation and actual damages because they didn't pay any of the fees that they complained about. And number two, they cannot prove that they assented to the terms and conditions based on their unrebutted testimonial admissions. There's no genuine dispute of material fact with respect to that issue. I'd like to correct a couple of misstatements that were made earlier. Number one, it's undisputed in the summary judgment record that Mr. Calderon's account, as Chief Judge Pryor indicated, had been canceled before the suit was filed. And in addition, none of the plaintiffs actually paid the fees, and there wasn't actually an insurance payment made for the fees at issue. The only fee that Mr. Marin complained about was a fee for administrative charges that his company paid, and the fees that Ms. Burrell complained about was paid by her employer. I'd like to address the collateral source doctrine very briefly. Before you do that, I want to ask you the flip side of the question that Chief Judge Pryor asked your learned counsel on the other side, which is, sixth, enforce these terms and conditions against the three appellants by charging them for these damages and administrative fees, but is now claiming that those terms and conditions don't apply. Is that right? Not necessarily, Your Honor. Sixth was operating under the assumption that the standard policies and procedures were followed by sending out a demand letter when six vehicles were damaged, asking the plaintiffs to pay for the damage associated with their rental. That's not an admission and doesn't show there was mutual assent. No matter what sixth did after the fact, it doesn't prove that the plaintiffs themselves actually assented to the terms and conditions at the time because they hadn't seen and had no idea that the terms and conditions even existed. What's interesting about the district court proceedings below on summary judgment is that the plaintiffs did not present evidence or even argue that they assented to the terms and conditions. Instead, what they argued was that this is one-sided, and you heard counsel earlier say that sixth should be bound by its terms and conditions, but where there is no mutual assent, neither party is bound. So it's not a situation where sixth intentionally tried to deceive by saying these are our terms and conditions, and they bind you, and you have to pay us. No, it was a simple mistake based on what they presumed to have happened at the time. And so for contract purposes, what matters is what happened at the time at the rental counter. Let's talk about that. Yes, Your Honor. Hold aside for a moment the FADUPA claim. Speaking for myself, that's easy. There was no damages. I think it's very hard to apply the collateral source rule here. Without it, the argument fails. Help me with the contract actions and whether there was an assent, a meeting of the minds about the critical terms. The face page signed by Calderon and everybody else explicitly says the following. By signing below, you agree to the terms and conditions printed on the rental jacket and to the terms found on this face page, which together constitute this agreement. You acknowledge you have been given an opportunity to read this agreement before being asked to sign it. What are we to make of that? Does that not take us at least part of the way under Florida law, Arizona law, Colorado law, to getting to incorporation by reference? I'm very glad that you asked that because the technical process for how the contract was executed really matters here because the plaintiffs did not actually sign a face page. They signed a little black box, as Mr. Marin indicated. A little black box. It's blank, has nothing on it but a signature line, and it is used by Sixt to capture electronic signatures onto face pages. Ideally, what would happen is the rental counter associate would hand a printed copy of the face page and then ask the renter to assent to it by signing the electronic box. Then the electronic box would send a signal to the computer system and save a TIF version of the full agreement, but that's not what happened here. These people were asked to sign the black box without having seen the face page, and they cannot have assented to the terms and conditions that are called out in the face page if they never saw the face page in the first place, which disposes of Mr. Marin's argument relating to availability. Easy availability and knowledge is the standard under— Just help me understand the practice here. Yes. I thought the customer signs the bottom of the face page but not the TNC. Did I get that wrong? Correct. They do not actually sign a piece of paper at all. And if you look at Ms. Burrell's testimony, she said, I signed something electronically, I didn't see or touch the face page until after I had signed the electronic black box. I thought the face page is directly above the signature line. Is that wrong? It is. So when a TIF copy of the agreement is created after the signature, the signature is transmitted through the computer system to an electronic database that holds the agreement, and then that's stored in the system. But the party, even if the procedure is followed correctly, the customer does not physically sign a document. They see the document, and they're supposed to see the terms and conditions with the document and then assent by signing the electronic signature pad. But in this case... Orbit. So Meriden used Orbit, right? Correct. Which required him to click a link assenting to the terms and conditions. Incorrect. The terms and conditions for 6 were not available on the Orbit's website, and there's no evidence in the record that they were. In fact, we were here on a prior appeal. 6 sent a confirmation email containing a hyperlink to the terms and conditions, did it not? It did not. There's no evidence in the record for that, and it wouldn't have anyway because the Orbit's terms and conditions, as Judge Pryor and Judge Marcus may recall from the prior appeal, those Orbit's terms and conditions, as this court held, only applied to the Orbit's reservation transaction, and there was no evidence to show that the 6 terms and conditions were available anywhere on the Orbit's website or anywhere in the confirmation emails. The 6 terms and conditions are only available on the 6th website, which Meriden and Burrell didn't use to book their rentals. Those are also separate transactions and separate agreements. Let me make sure I understand your position. So are you agreeing that under the law of the 3 states, the language that Judge Marcus read would have been sufficient, but in this case the facts are such that the 3 appellants did not have an opportunity to read and sign the face page? The test is different under the 3 states, but I would say no. Based on the precedent that the lower court set in this case, based on French's discussion of U-Haul versus Acabe, and based on the Bacon decisions, with respect to Mr. Meriden, that language would have definitely been sufficient, if he had seen it, but he didn't. The Lucas versus Hertz case... And you're certain when I look at this record, it's not going to have that hyperlink evidence that I just mentioned? Yes, Your Honor. If you go onto the Orbit's website... Because I don't think this is right. I don't think that... I mean, it's one thing to say what the import of the evidence would be. I don't like it when we're not clear about what the record... The record says whatever the record says. Yes, Your Honor. There's zero evidence of the terms and conditions from the Orbit's website or from the confirmatory email in the record, and there's no proof that those links go to the 6th website. They don't. And with respect to the language of the face page, under Colorado law and under Florida law... Again, just help me with the facts. I may not have it right. Doesn't Meriden's signature appear on the bottom of the face page? It appears in the system version of the face page. Is that a yes? It is yes in terms of the electronic copy, but he didn't sign a physical piece of paper or an electronic copy of the face page. Right, but he had to hit a button. How does his signature appear on the bottom of the face page if he did nothing, neither mechanically with the press of a button or with a pen? The way the 6th technology works, and if you look at the Vitale-Renner v. 6th trial transcript and the court's order in that decision by Judge Cannon, you can see more of the discussion of the technology. But the record in this case, what happens is the rental counter-associate gets the credit card from the customer. They check it. They check their ID. They put their credit card into a credit card machine. They click Accept for the credit card charges. At that point, the rental counter-associate is supposed to pull up two pieces of paper. There's a printed version of the face page that's blank and has no signature on it. There's a copy of the terms and conditions. They're supposed to hand it to the customer, walk them through the terms, and say, if you accept these, please sign this electronic signature pad, which Mr. Meriden and Sue Ellen Calderon described as a blank, black box. The problem was, for each of these three rentals, the customers walked up, they gave their credit card, and then they were just asked to sign a blank, black box without being shown any of the terms. Now, with respect to your question as to how the signature gets onto the face page, that's done through the electronic system that 6th has. It takes the image of the signature and embosses it on the TIFF copy of the face page and stores it in the system. Those TIFF copies of the face pages you see were produced out of 6th's files. They're not wet signatures. They weren't produced by the plaintiffs. By contrast, if you look at Burrell, her paper copy of the face page that she has is unsigned, and she got a paper copy of the face page after she signed the signature pad. A customer at that time, and this is not how 6th contracts today. They changed their procedures shortly after these rentals. At that time, the customer walked out the door  The signature was only captured and stored in the system using that electronic signature pad technology, much like the signature pads that you use at a grocery store or at a restaurant, something like that. So that's how the technology works. So where you see their signatures below that line, none of them ever saw that line. If I book online, am I not required to assent to the rental jacket terms? Today, that is the case. Was it the case at the time when these folks rented these cars? Marin and Burrell. Calderon, for example. Good question. So Calderon is the only one who booked through the 6th website. If you booked through a third-party website at the time, you would not have accepted the 6th terms and conditions. The problem for Mr. Calderon, who testified that he didn't agree when he booked online, was that the terms and conditions at the time he booked were different than the terms and conditions when he actually walked up to the rental counter. The plaintiffs talk about 6th. So in the case of Calderon, the problem is not that when he booked online he was required to assent to the rental jacket terms. He did. Your argument is all that's true in his case, but the contract changed. Correct, Your Honor. It's a separate agreement. There's the reservation agreement, which he held the price and made sure the vehicle was there and available for him, based on the commercial terms that were laid out on the website, which we don't have evidence of. In fact, there's no evidence of which copy of the terms and conditions were in the record at the time, but we know that it changed. How do we know that? Based on discovery responses from 6th, and I believe it's also in... No, I believe it's only in the discovery responses from 6th. So interrogatory answers, what are they exactly? I think they were actually in responses to document requests, but I think they were affirmed by one of the witnesses, but I can't say that with certainty. So by the time he gets to the... There's no evidence from which a jury could reasonably infer that the Orbitz website would have required clicking to the terms and conditions? That is correct. There's no evidence that the Orbitz website or the Hotwire website that Burrell used would have required them to assent to the 6th terms and conditions. We investigated this up and down. We tried very hard to find ways that we could compel arbitration, which we previously were unsuccessful on, in part because the 6th terms and conditions were not part of those bookings. You're telling me, though, that today, if you did it through Orbitz, you would have to do that? You would not. It's still the case that... And in fact, the court may recall from the prior appeal that Orbitz and the other websites have shrunk their arbitration agreements. Sorry. I don't know anything about a prior appeal. That's fine. I apologize. So the Orbitz terms and conditions, the Hotwire terms and conditions, they don't incorporate by reference or show you a link to the 6th terms and conditions. They show you a link to what are called the 6th rental rules, but those are commercial terms, and there are some terms there about appropriate pickup, etc., but nothing about damage claims, nothing about the fee... What did the Orbitz booking website require Marin to do when Marin rented the car? It required him to assent to the Orbitz terms of use and Orbitz privacy policy agreement and the Orbitz booking terms and conditions. I thought it required Marin to view a page which stated that, and I quote, by selection to complete this booking, I acknowledge that I have read and accept the rules and restrictions, the terms of use, privacy policy, and government travel advice. Did she sign that? Mr. Marin did agree to that. Those are not the 6th terms and conditions that are at issue. The rules and restrictions, which are in the record from the motion to compel arbitration of Mr. Marin, those rules and restrictions aren't the terms and conditions that the plaintiff sued about.  In their complaint, they're alleging that the terms and conditions at the rental counter that they received are the ones that were breached. But the problem is there's no evidence that they assented to it. And I definitely understand. We're in a bit of a topsy-turvy situation, but there's no genuine dispute of material fact when the plaintiffs who have the burden of proof are saying we didn't agree to the terms, we never saw them, because availability isn't sufficient under any law, and 6th is saying we agree. The plaintiffs have argued several times, we conceded we agreed to the terms and conditions, but because they bear the burden of proof, that's not sufficient. So we're in the opposite situation that companies normally find themselves in. We're just following the facts and the evidence as it came out. Okay. Mr. Emery, I think we understand your case. Thank you. Let's hear from Mr. Warwick. It's heads I win, tails you lose. Tell us what the record says, Mr. Warwick, because I came in thinking one thing about the record. Your opposing counsel tells me something else that's going to require me to go back and look at it. Do you have a different reading of this record? And if so, where would you point me to look and what am I supposed to understand? So the reason I skipped during my initial argument to what happens at the rental counter is because that's the same for everybody. The law says all that's required is you have a copy of that rental agreement available at the rental counter. It's undisputed that there were copies in the building. Now, there is no testimony in the record from any employee of 6th. So there's nobody who comes out and says, oh, yeah, we didn't follow those procedures that day. What we have is testimony... He testifies to that, right? Right. He says, I don't think I received... You know, I don't remember it. I didn't receive the terms and conditions. So let's say he says that. Okay, so what evidence in the record would allow us to infer, or would allow a fact finder to infer that he assented to the terms and conditions? Two ways. He came in and gave his signature to the face page, and the face page has language in it that says specifically, I'm adoptive. And you say he came in, gave his signature to the face page. You mean he put his John Hancock on it? On an electronic pad. Okay, so not when he walked in the door and said, here I am, here's my credit card. Did he sign anything then? That's when he signs, they give him an electric pen, and then he signs a key. Yeah, but he's accepting the credit card charges. That's what he's accepting when he signs that. But those credit card charges are on the face page. That's the only place they exist, is on the face page. But he testifies he wasn't shown the face page or any contract terms before signing. That's what he testified, right? Right, but you can't get to that electronically. And he wasn't handed any papers. Right, because it's all electronic. And so the way they've set it up is, they've set it up in such a way that when you try to say, well, what are the terms, they give it to you electronically, and if you want to challenge those terms, they say, well, we're not going to tell you or we have no agreement what those terms are. So what we know is two things. The electronic signature is on the face page. It was attached there by 6th. Every client has a signature on an electronic face page. That face page has language in it that specifically incorporates the terms and conditions. That specific incorporation, along with the fact that the terms and conditions were available at every single rental car location, that's enough under the law to have a binding agreement. Now, Ms. Burrell has an additional fact. She actually has a physical copy of her printed face page and a physical copy of the rental jacket that she got and produced it in discovery. So when the trial court here found that there was no evidence that she entered into the contract, she had both pieces of paper. She had the piece of paper that was the face page that was given to her at the rental counter, and she had the deal jacket or the rental jacket that contained the terms and conditions. Did she testify, though, that she only saw what was written on there after she had signed? Right, but, you know, people sign stuff that they don't read all the time. Do you agree with Mr. Emery that when they sign, all they see is a pad with a space for a signature? Right, and we have no testimony from any employee about whether they were shown it or not. Like, I'm not... it strikes me as strange. In three different locations, at three different parts of the United States, on one day, a particular employee suddenly didn't follow the procedure. And we don't have any testimony from any sixth employee about what happened. I'm unclear what you're saying is the procedure. Was the procedure to show a copy of the face page before they signed on the line? Yes, and that's in the... I quote... In our initial brief, there's a big quote about the declaration that was given in response to our interrogatories by sixth that lays out five separate ways they were shown the face page. All these different... are the terms and conditions. All five different ways. And the last one is, once you get to the counter... I mean, we've all rented cars. It's a standard procedure when you rent the cars. It's not crazy unusual at sixth. You walk up, they tell you, give me your name, you've got this car, it's for this many days, give me your credit card. And that's what happened. Now, do they have specific recollection of what happened? No, but I can't remember what happened. Did they say they didn't remember or did they say they didn't see it? I thought they said they didn't see it. So then we don't need the testimony of the person from the rental counter because we have their testimony uncontroverted that they never saw the face page until after they had signed. Right, and so the question is, is that their memory? Is it that they didn't see it? They must have seen something because they signed the patent. Right, but you understand the burden rests with you to establish the incorporation by reference, right? You have the burden, is that correct? Correct. So what we're really asking you, simply put, is how do you meet your burden of establishing for each of the three that these documents were incorporated by reference? Twofold. They all signed a face page. The face page references the terms and conditions. We have that signature for sure. They're enforceable all across this country right now. If we affirm the trial court here and throw it, throw this body of law to the wind and no longer, you have to now remember it in order to be enforceable, we're gonna have a problem. But here's the point. After they got the bill, they paid it, Judge. They paid it. And the fact that they paid it shows they thought they were bound by those terms and conditions. And that's the piece of evidence we have. So for a summary judgment standard when you can have no evidence, no genuine issues of material fact, there clearly are genuine issues on which a jury could find that, yes, this is the way it was set up. When they signed it, they may have not remembered, but it may be there. It's just not so clear cut on a summary judgment standard under these particular facts where it's hard for us to even articulate it, much less to have it so cut and dry that summary judgment is a vote. We'll take a close look at the record, Counsel. Thank you, Mr. Warwick. I think we understand your case. We'll move to the last one. YM.